AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
6/8/22
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.
4242 GARDENDALE AVENUE )  3:22-mj-185
DAYTON, OHIO 45417 )
INCLUDING ALL OUTBUILDINGS AND CURTILAGE )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the    Southern    District of    Ohio   , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute controlled substances |

The application is based on these facts:
SEE AFFIDAVIT IN SUPPORT

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

TFO DUSTIN J. PHILLIPS, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by    telephone    *(specify reliable electronic means)*.

Date: June 8, 2022

City and state:  DAYTON, OHIO     Caroline H. Gentry, United States Magistrate Judge

## ATTACHMENT A

**Location 1:** The place to be searched is 4242 Gardendale Avenue, Dayton, Ohio 45417 and the surrounding curtilage. 4242 Gardendale Avenue, Dayton, Ohio is a one-story beige, single family home with a white front door and glass screen door with white metal bars. 4242 Gardendale Avenue is located on the south side of Gardendale Avenue. 4242 Gardendale Avenue, Dayton, Ohio 45417 is further depicted in the following photograph.



## ATTACHMENT B

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. § 841(a)(1) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to fentanyl, and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J. Firearms and ammunition.

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Dustin J. Phillips, a Task Force Officer ("TFO") with both the Federal Bureau of Investigation ("FBI") and City of Dayton Police Department ("DPD"), hereby make the following sworn statement under penalty of perjury:

## INTRODUCTION

1. I have been employed as a sworn law enforcement officer with the DPD for the past fourteen (14) years. I currently a Detective with the DPD. I am also presently assigned as a TFO with the FBI Dayton Resident Office's Safe Streets Task Force (SSTF). As such, I am sworn under the Title 21, United States Code ("U.S.C."), Section 878, to serve as an officer of the United States duly authorized to conduct federal criminal investigations and execute federal arrests for violations of offenses set forth under Titles 18 and 21 of the U.S.C.

2. I am also a TFO with the DPD's Major Case/Drug Enforcement Unit. Since 2013, I have concentrated on narcotics, firearms, and gang-related criminal investigations. During my law enforcement career, I have attended numerous law enforcement training courses and seminars concerning the investigation of drug trafficking organizations. I have participated in many firearm-related arrests and executions of search warrants that have resulted in the seizure of large quantities of narcotics and firearms. I have additionally participated in many undercover - purchases of narcotics, and supervised the activities of police informants. I have also personally participated in investigating individuals suspected of possessing, manufacturing, distributing, and importing large quantities of various controlled substances. Based on my extensive law enforcement training and experience – I am familiar with the various manners and means drug traffickers and their criminal organizations typically employ within the United States. Based on

my afore mentioned training and experience, I am familiar with the typical *modus operandi* employed by individual criminals and criminal organizations involved in the illicit distribution of controlled substances. As such, I know the following:

a. It is common practice for drug traffickers to conceal their criminal assets, their addresses, their telephone numbers and their telephone beeper/pager services through the use of third parties to avoid detection by law enforcement officials.

b. It is also common practice for drug traffickers to maintain residences or so-called "stash houses" to store and distribute drugs  Additionally they will commonly use "nominees" to obtain telephone services, utility services, and other miscellaneous services to conceal their true identity and criminal involvement.

c. It is also common practice for drug traffickers to place personal assets under the purported name/title of corporate entities in order to avoid detection of those assets by law enforcement officials.

d. It is also common practice for drug traffickers to maintain *de facto* dominion and control over said assets.

e. It is also common practice for drug traffickers possess large amounts of U.S. Currency in further the ongoing operation of their illicit drug business.

f. It is also common practice for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The said books, records, receipts, notes, ledgers, and other documents are commonly maintained by drug traffickers in locations wherein they enjoy a ready access to them.

g. It is also common for drug traffickers to provide false information to law enforcement officials regarding their actual identity and personal residences.

h. It is also common for drug traffickers to conceal from law enforcement their connection, control and/or ownership of vehicles, business assets, drug inventories, large amounts of currency, financial instruments, jewelry, and evidence of financial transactions relating to the acquisition and concealment of large sums of money that are tied to their drug trafficking activities.

i. It is also common for drug traffickers to amass large proceeds from the sale of drugs, and then subsequently attempt to hide the true source of these profits, to wit: launder money. To accomplish this, drug traffickers typically utilize banks and/or other financial institutions to use cashier's checks, money drafts, and letters of

|     |     |
| --- | --- |
|     | credit. Other institutions commonly used include real estate firms and other legitimate business fronts. |
| j. | It is also common for drug traffickers to travel to facilitate their drug trafficking activities. Specifically, it is common for drug traffickers to transport, or cause to be transported, wholesale drug shipments from source cities to other locations where retail distribution will occur. Common methods of transportation include, but are not limited to, the use of commercial airlines, and rental/private automobiles and trucks. |
| k. | It is also common for drug traffickers to maintain books, ledgers and other documents which reflect names, addresses, and/or telephone numbers of their customers, criminal associates and conspirators. This information is often be stored in cellular phones in places such as the contacts list. |
| l. | It is also common for drug traffickers to take, or cause to be taken, photographs of themselves, their associates, their property and their drug product. These photographs have been known to be maintained and stored at their personal residences and/or businesses. These photographs have been known to be commonly be stored in personally owned cellular phones. |
| m. | It is also common for drug traffickers to commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are commonly used to protect and secure a drug trafficker's person and property which may include, but is not limited to, narcotics, jewelry, drug paraphernalia, books, records, and U.S. Currency. |
| n. | It is also common for drug traffickers to maintain hidden compartments inside their residences and vehicles to secret drug trafficking related evidence, i.e., money, ledgers, drugs, etc. It additionally common for drug traffickers to bury evidence in containers such as shoe boxes, or secret evidence in personal safes and lock boxes. |
| o. | It is also common for drug traffickers to refrain from openly discussing drug related topics and details on the telephone, i.e., specific drug quantities, prices, dates, and methods of delivery of drugs, etc. These types of detailed conversations are more typically engaged in during face-to-face private transactions. As such, most drug trafficking related telephone conversations tend to be very brief in duration and oftentimes use "coded" or "street" language". Such conversations are typically only understood by the traffickers themselves and designed to mislead or confuse non-participants of the conversations. Drug traffickers tend to make extensive use of cell phones and text messaging beepers/pagers to facilitate their communications. When calling a beeper or text messaging, drug traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The typical structure of a drug distribution organization consists |

3

of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors typically have more than one source of supply; likewise, the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his/her closest associates. Most of the drugs, (as well as diluting and packaging materials and weighing equipment), are typically stored at the "stash house."

p. It is also common for drug traffickers to use rental vehicles for everyday travel. They will also typically maintain another vehicle(s), usually at an out of sight location, to otherwise facilitate their drug trafficking business. Drug traffickers commonly title their vehicles in the names of third parties.

q. It is also common for drug traffickers to have saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed on their cell phone(s).

r. Based upon my prior training and experience, I have repeatedly observed drug traffickers distribute a cell phone number to their drug customers, which is referred to as a "money phone." These money phones are primarily used to communicate with retail drug customers. These customers call the drug trafficker on that cell phone number to arrange a purchase of drugs as needed. The drug trafficker will often times simultaneously field calls from several customers, directing their customers to travel by car to a designated meet location. Once all the customers have arrived at the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then depart the scene.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of an application for a search warrant for the residential premises known as 4242 Gardendale Avenue, Dayton, Ohio 45417, including all outbuildings, basements, garages, or sheds located on its curtilage, (hereinafter "**Location 1**"). **Location 1** is more fully described in Attachment A, which is incorporated herein by reference. As detailed below, I submit that probable cause presently exists to believe that certain evidence of drug trafficking, to wit: Possession with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, § 841, can and will be found inside **Location 1.**

4. A specific list of items to be seized from **Location 1** are described in Attachment B, which is also incorporated herein by reference. I have elected not to include every detail known to the present investigation, but only have set forth information deemed necessary to establish probable cause that the evidence associated with above-described drug trafficking offense is located at **Location 1**.

## PROBABLE CAUSE

5. On October 20, 2021, a telephone complaint was received by the Miami Valley Crime Stoppers Tip-Line. This tip indicated that there was purported drug activity occurring at **Location 1**. The tipster indicated that there purportedly was "heavy traffic from 7:00 AM till about 8 PM every day". This tip did not identify suspect(s) name(s). Based on two previous drug trafficking investigations I personally conducted on a person identified as **IREIN EDWIN JOHNSON**, (hereinafter referred to as **"JOHNSON"**), I know of his direct connection with the residence located at 4242 Gardendale Avenue.

6. Based upon my two previous investigations of **JOHNSON**, I am aware that he has a 2007 felony drug possession conviction in Clark County Common Pleas Court; a 2013 misdemeanor conviction in Dayton Municipal Court for aggravated menacing; and at least three (3) prior felony convictions in 2019-2020 for possession of fentanyl in Montgomery County Common Pleas Court. I am aware that **JOHNSON** purchased **Location 1** in March 2020. I have personally checked the Montgomery County Auditor database and confirmed that **Location 1** is presently owned by an "Irein and Satoria Johnson". Based on my previous investigations of **JOHNSON**, I know that Satoria is in fact **JOHNSONS'** wife.

7. On November 1, 2021, I conducted surveillance of **Location 1**. During this surveillance, I observed several vehicles arrive at **Location 1** and proceed into the backyard area. The backyard of **Location 1** is currently surrounded by a tall privacy fence, so I was unable to

5

observe the vehicles or the occupants after they drove into the backyard area. I am familiar with **Location 1's** backyard based upon prior surveillance I conducted before the present fence was constructed. As such, I know of the existence of an entry door on the east side of the house which accesses the backyard. All the vehicles observed remained there for only a few minutes, and then immediately departed. Due to said Tip-Line complaint, as well as my personal knowledge of **JOHNSON's** past drug related activities, I believe drug trafficking related activities continue to occur in or around the backyard door at **Location 1**.

8. On the said November 1, 2021, while occupying an unmarked vehicle, I personally followed one of the vehicles that departed the backyard of **Location 1**. A short time later, I requested a marked police cruiser to conduct a traffic stop on the same departing vehicle a short distance away from **Location 1**. Once this vehicle was traffic stopped, the occupants were removed from the car. Upon my arrival on-scene I continued my investigation. Prior to my arrival, one gelatin capsule with a white powder residue inside was located inside the vehicle. I spoke with the occupants who advised me that the capsule was just purchased from **Location 1**. The contents of the capsule had been consumed however there was still a small amount of residue located inside the vehicle which I collected, and later submitted to the Miami Valley Regional Crime Laboratory (MVRCL) for forensic testing.

9. On January 19, 2022, the MVRCL returned the drug analysis report that confirmed the residue found inside the gel capsule was Fentanyl, a Schedule II controlled substance.

10. Since said date, I continued to periodically check **Location 1** for suspected drug trafficking activity. On several occasions, I observed similar vehicular and foot traffic entering and exiting **Location 1** which is consistent with drug related activity. On two separate occasions, I observed **JOHNSON** depart **Location 1** driving a silver Buick sedan. I was unable to observe the license plate on that vehicle at that time.

11. On May 9, 2022, I conducted surveillance of **Location 1**. On this occasion I observed a black Chevrolet Malibu arrive at said residence and pick up **JOHNSON**. I followed this vehicle as it drove to a residence located in the 800 block of Huron Avenue, in Dayton, Ohio. **JOHNSON** exited said vehicle and immediately entered a silver Buick Lucerne that was parked near the south end of the block. Said vehicle displayed Ohio license plate GXT5165. An OHLEG check of this plate revealed this vehicle was registered to a Burnette Hardnett, which I know from my previous investigations to be **JOHNSON's** mother. Further, this is the same vehicle I previously observed **JOHNSON** driving. **JOHNSON** immediately pulled the Buick from the curb and drove directly back to **Location 1**. Seeing this, it appeared as though **JOHNSON** was storing this vehicle at this location prior to being dropped off.

12. On May 12, 2022, I observed **JOHNSON** drive a red Slingshot automobile. This vehicle is unusual because it only has three wheels. I have previously observed **JOHNSON** driving this same Slingshot on numerous occasions. On this occasion, **JOHNSON** was accompanied by a light skinned female passenger.

13. A short time later, I departed for **Location 1** where I again began surveillance. On this occasion, I observed three separate people arrive on foot and enter the back yard of the property. Additionally, a silver Jeep Liberty automobile arrived and pulled into the rear of the property. Immediately afterwards, **JOHNSON** and the same light skinned female arrived in the red Slingshot. He pulled this vehicle into the rear of the property which was outside my field of view. Based upon my two previous investigations, I know that **JOHNSON** and other visitors to **Location 1** commonly use the rear door to enter the premises. I remained on scene and continued surveillance of the house. A short time later, I observed **JOHNSON** and the same light skinned female depart the premises. I was able to follow them back to the same 800 block of Huron Avenue where he parked the Slingshot and walked into the side yard of 821 Huron Avenue and

7

out of my view. I also observed his silver Buick Lucerne parked on the street directly in front of where they just parked the Slingshot.

14. I later accessed the DPD Management Information System (MIS) to see if there were any past Field Interview Card (FIC) records related to the address of 821 Huron Avenue. I located a FIC entered on June 1, 2021, by DPD Sergeant Jonathan C. Sopczak. This entry listed a Whitney Ross as the person interviewed. In this FIC, Ross' home address was listed as 821 Huron Avenue. I then ran Ross' information through *JusticeWeb* law enforcement data base and determined there to be several booking photographs of Ross. I immediately recognized her as the same female I had observed **JOHNSON** with on two separate occasions earlier in the day. There was an additional April 20, 2021, FIC entered by DPD Officer Scott A. Myers. This FIC indicated that Whitney Ross "may be part of drug trafficking from Ohio to Tennessee".

15. I contacted DPD Officer Colin Patterson who is currently in charge of the Miami Valley Crime Stoppers Unit. I asked him I he any records of tips related to **Location 1**, 821 Huron Avenue, Irein Johnson, or Whitney Ross. Officer Patterson responded there were several prior Crime Stoppers tips relevant to my investigation. In addition to the original October 10, 2022, tip, another tip was also received on December 22, 2021, which alleged that Whitney Ross was "currently cohabitating with another drug dealer, Irene Johnson". The tip went on to allege that Ross was suspected to be part of a multi-state drug trafficking organization. A third tip dated March 15, 2022, claimed a known fugitive named Kayleigh Nelson was then living at **Location 1.** This tip did not give any specific information, but in the "any other comments" section, the tipster simply responded "Iran Johnson". I ran Nelson's criminal history information and determined that she currently has one outstanding warrant for Theft issued by the Vandalia Municipal Court; and one outstanding warrant for Robbery, Grand Theft, and Aggravated Possession of Drugs issued by the Montgomery County Common Pleas Court.

8

16. On May 16, 2022, I again performed spot checks at **Location 1** and 821 Huron Avenue. At **Location 1** I observed **JOHNSON's** aforesaid silver Buick parked in the back yard. I then traveled to 821 Huron Avenue and located two vehicles parked directly in front of the house on the street. The first was a black Jeep Grand Cherokee with Ohio license plate HKS4539. I ran that license plate through OHLEG and determined it is registered to **JOHNSON's** mother, Burnette Hardnett. The second vehicle, a black Chevrolet Malibu with Ohio license plate JMQ3575, was determined via an OHLEG check to be registered to a Dominique Rutlin. This is the same vehicle I observed transport **JOHNSON** from **Location 1** to 821 Huron Avenue on May 9, 2022.

17. When I went past **Location 1** on May 16, 2022, I observed that the residence's trash can had yet to be put out to the curb for pickup. I returned to this residence several hours later and observed that the trash can had been brought out to the curb. **JOHNSON's** silver Buick remained parked in the back yard of the residence. A law enforcement trash pull was performed on the residence's trash can. Detective Lucas A. Rose and I examined the contents of the trash for any evidence. Inside the trash was discovered several items of suspected evidentiary value. These included: two (2) sandwich baggies, each of which contained a white powder residue; three (3) sandwich baggies that appeared to have marijuana residue inside; one empty "GoodSense" brand cardboard box for 100 count sandwich bags; six (6) bottles of "Dormin" brand sleep aid pills; two (2) empty 1,000-count gelatin capsule bags; several unused clear gelatin capsules; and one half of a gelatin capsule that contained a white powder residue. Each of the Dormin bottles were closed. Each of the six bottles were filled with pink capsules. Each of said capsules had been broken open and no longer contained any medication.

18. At that point, Detective Rose and I conducted Cobalt Reagent field tests on each of the two sandwich baggies which contained white powder residue, as well as the half gelatin capsule that also contained white powder residue. Each of these three (3) field tests reported positive results

9

for the presence of cocaine. Photographs were taken of all the items recovered and they were tagged into the DPD Property Room. Each of these items were submitted to the MVRC for confirmatory forensic tests.

19. Based upon my prior law enforcement training and experience, I am aware that sandwich baggies, specifically "GoodSense" brand baggies are commonly used by drug traffickers to package individual amounts of narcotics. I am also aware that gelatin capsules are commonly used by drug traffickers to package individual amounts of narcotics. Further, I am aware that "Dormin" brand sleep aid is commonly used as a cutting agent by drug traffickers. "Dormin" sleep aid pills are pink, therefore the presence of six bottles of empty pink "Dormin" capsules indicate evidence of suspected large scale trafficking operation.

20. Over the following several weeks, I conducted various spot checks on **Location 1**. On each occasion, I observed **JOHNSON's** silver Buick parked in the back yard of said residence.

21. On June 6, 2022, I again checked **Location 1** and observed the trash can was placed out on the curb for pickup. **JOHNSON's** silver Buick was not observed then parked at this house. On this occasion I did observe this vehicle parked on the curb in front of 819 Huron Avenue which is located several blocks away. A law enforcement trash pull was conducted at **Location 1** and bags of trash were collected from inside the trash can. I examined the trash contents for any possible relevant evidence. I located several items of suspected evidentiary value inside the trash. These items included: five (5) whole sandwich baggies, each of which contained a white powder residue; one (1) torn sandwich bag corner, which contained a white powder residue; three (3) gelatin capsules, each of which contained a white powder residue; and two (2) empty 1000-count gelatin capsule bags.

22. I conducted a Cobalt Reagent field test on the residue found inside the torn baggie corner, which tested positive indicating the presence of cocaine. I then met with FBI SA Robert Buzzard who tested the contents of one of the gelatin capsules. SA Buzzard utilized a *TruNarc*

10

Handheld Narcotics Analyzer to test the residue from the capsule. This test revealed the presence of "Fentanyl Compound or Methamphetamine" in the capsule. Photographs were taken of each of these positive tests and all the items recovered were tagged into the DPD Property Room as evidence.

23. Based upon the number of baggies observed with white powder residue collected from the trash, along with the number of empty Dormin capsules, together with the presence of four (4) empty 1000-count gelatin capsule bags collected in the past three (3) weeks, are all consistent with evidence of a large-scale drug operation at **Location 1**.

## CONCLUSION

24. Based on the facts set forth in this Affidavit, I believe probable cause exists to conclude evidence of drug trafficking activity will be found inside **Location 1**. Specifically, it is your Affiant's belief that evidence of violation of Title 21, United States Code § 841, can and will be found inside **Location 1**.

Dustin J. Phillips
Task Force Officer
Federal Bureau of Investigation

Sworn and subscribed before me via telephone on this __8th__ day of June, 2022.

Caroline H. Gentry
United States Magistrate Judge

11